### In re GRAND JURY.

(District Court, N. D. California. July 13, 1894.)

**1. CONSPIRACY—OBSTRUCTION OF INTERSTATE COMMERCE.**
Any combination or conspiracy on the part of any class of men who by violence and intimidation prevent the passage of railroad trains engaged in interstate commerce is in violation of Act July 2, 1890, declaring illegal every contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce among the states.

**2. MAIL—OBSTRUCTING PASSAGE.**
It is a violation of Rev. St. § 995, declaring it an offense to knowingly and willfully obstruct or retard the passage of the mail, for one to prevent the running of a mail train as made up, though he is willing that the mail car shall go on, and his purpose is other than to retard the mails.

**3. SAME.**
The railway is a great public highway, and the duty of the railroad company as a common carrier is first to the public. The road must be kept in operation for the accommodation of the public, if it is possible to do so with the force and appliances within reach. Any negligence in this respect is not excused by temporary difficulties capable of being promptly removed.

**4. SAME.**
Where the transportation of the mails and interstate commerce has long been interrupted by the refusal of the employés of the railway company to move trains carrying Pullman cars, it is the duty of the railway company to use every effort to move the mails and interstate commerce, without regard to the make-up of regular trains; and any willful failure to perform this duty is a violation of the statute.

**5. GRAND JURY—FINDING—INDICTMENT.**
An indictment should only be found where the grand jury believe that the evidence before them would warrant a conviction.

Charge to the grand jury by MORROW, District Judge:

Gentlemen of the Grand Jury: You have been summoned and sworn as grand jurors of the district court of the United States for the northern district of California. It now becomes my duty to in·struct you concerning the duties you will be called upon to perform under the laws of the United States.

The extraordinary occurrences in this state during the past two weeks require your immediate attention, and call for a thorough and sweeping investigation. It is a matter of public notoriety that during this time a great railroad strike has prevailed; that the most important channels of trade and commerce carried by railway service have been closed, the business operations of the state paralyzed, and the passage of the mails seriously retarded and obstructed at several points in the state. The constitution of the United States provides that congress shall have power to regulate commerce among the states and establish post offices and post roads. Pursuant to the first of these provisions, congress has provided by the Act of July 2, 1890, that

"Every contract, combination in the form of trust or otherwise or conspiracy, in restraint of trade or commerce among the several states, or with foreign nations, is hereby declared to be illegal. Every person who shall make any such contract or engage in any such combination or conspiracy shall be deemed guilty of a misdemeanor, and on conviction thereof shall be punished by fine not exceeding $5,000 or by imprisonment not exceeding one year, or by both said punishments in the discretion of the court."

"Trade" has been defined as "the exchange of commodities for other commodities or for money; the business of buying and selling; dealing by way of sale or exchange." The word "commerce," as used in the statute and under the terms of the constitution, has, however, a broader meaning than the word "trade." Commerce among the states consists of intercourse and traffic between their citizens, and includes the transportation of persons and property, and the navigation of public waters for that purpose, as well as the purchase, sale, and exchange of commodities. County of Mobile v. Kimball, 102 U. S. 702; Gloucester Ferry Co. v. Pennsylvania, 114 U. S. 203, 5 Sup. Ct. 826. The primary object of the statute was undoubtedly to prevent the destruction of legitimate and healthy competition in interstate commerce by individuals, corporations, and trusts, grasping, engrossing, and monopolizing the markets for commodities. U. S. v. Patterson, 55 Fed. 605. But its provisions are broad enough to reach a combination or conspiracy that would interrupt the transportation of such commodities from one state to another, and in this view the scope and purpose of the statute have been the subject of consideration in the courts, notably in the case of U. S. v. Workingmen's Amalgamated Council, 54 Fed. 995. That action was brought by the United States in the eastern district of Louisiana against the Workingmen's Amalgamated Council of New Orleans, La., and others, to restrain the defendants from interfering with interstate and foreign commerce. The facts were that a disagreement had arisen between the warehousemen and their employés and the principal draymen

and their subordinates concerning the recognition that should be accorded by the employers to the demands of certain labor organizations in New Orleans, and it was threatened that unless there was an acquiescence in these demands all the labor organizations would leave work, and would allow no work in any department of business, and violence was threatened in support of the demands. In some branches of business the effort was made to replace the union men by other workmen. This was resisted by the intimidation springing from vast throngs of the union men assembling in the street, and in some instances by violence, so that the result was that by the intended effects of the doings of the defendants not a bale of goods constituting the commerce of the country could be moved. It was held by the court that the facts of that case brought it within the provisions of the statute. In other words, it was determined that a combination of men who by violence and intimidation restrained trade and commerce among the several states or with foreign nations were acting in violation of this law, notwithstanding they may have had in view some other purpose in relation to their employment. You will observe that in this case the elements of intimidation and violence were present. It was not a case where the men merely quit work, putting their employers to no other inconvenience than of securing other men to fill their places, but it was a case where force and intimidation were used to prevent any one in that locality from engaging in the lawful and necessary business of moving the commerce of the country. The order granting an injunction in that case was affirmed by the circuit court of appeals in the fifth circuit. 6 C. C. A. 258, 57 Fed. 85. The law as thus declared by a court of recognized ability and authority was recently applied by Judge McKenna of the circuit court of this district in like manner to one feature of the state of affairs to which I am now directing your attention. This law determines that any combination or conspiracy on the part of any class of men who by violence and intimidation prevent the passage of railroad trains engaged in transporting the interstate commerce of the country is a violation of the act of July 2, 1890.

Another agency of the government is involved in the transportation of the mails, and to protect and secure the efficiency of that branch of the service it has been enacted that all railroads or parts of railroads which are now or hereafter may be in operation are established as post roads (Rev. St. § 3964); that the postmaster general shall in all cases decide upon what trains and in what manner the mails shall be conveyed (section 3, Act March 3, 1879; 20 Stat. 358); and every railway company conveying the mails shall carry on any train which may run over its road, and without extra charge therefor, all mailable matter directed to be carried thereon, with the person in charge of the same (Rev. St. § 4000). It is further provided in section 3995 of the Revised Statutes that "any person who shall knowingly and willfully obstruct or retard the passage of the mail, or any carriage, horse, driver or carrier carrying the same, shall for every such offense be punished by a fine of not

more than $100." This statute has also been before the courts in cases where bodies of men operating as labor organizations have prevented the passage of trains carrying the mails. In the case of U. S. v. Clark, in the district court of the United States for the eastern district of Pennsylvania (23 Int. Rev. Rec. 306, Fed. Cas. No. 14,805), the defendant was one of a number of persons who assembled at the depot of the Lehigh Valley Railroad at South Easton, Pa. On the arrival of the mail train at the depot, the defendant, who had no connection with the train, said to persons having charge of it that the mail car could go on, but not the rest of the train. The defendant afterwards got on the train, and, with others, placed it on a siding, where it remained for several days. Judge Cadwallader, in charging the jury upon these facts, said:

"The defendant is charged with retarding the transportation of the mail. * * * The mail, in point of fact, was retarded, as the postmaster testifies, two or three days. The occurrence which retarded it, according to the tendency of the proofs, was that several persons were assembled at the depot at Easton for no lawful purpose, and that one or more of them declared that the mail might go on, but the passenger train should not. They uncoupled the mail, and afterwards coupled it for the purpose of carrying it, as they did, to a siding. If that was the fact, and their purpose was to retard the train which transported the mail, it matters not, in point of law, whether they were or were not willing that the mail car or baggage car or the particular vehicle carrying the mail should go on."

The learned judge then quotes with approval the opinion of Judge Drummond of Chicago upon the subject, as follows:

"In relation to the transportation of the mails by means of railroads it is true that it appears by the evidence in this case that these defendants were willing that the mail car should go, but it must be borne in mind that the mail car can only go in such a way as to enable the railroad to transport the mail where there are other cars accompanying it. It is not practicable, as a general thing, for a railroad to transport a mail car by itself, because that would be attended by serious loss; so that while nominally they permit the mail car to go, they really, by preventing the transit of other passengers cars, interfere with the transportation of the mails."

You will observe that the law is applicable to the case of an obstruction interposed for a purpose other than that of retarding the mails. This was decided to be the law by the supreme court of the United States as long ago as 1868 in the case of U. S. v. Kirby, where it was said:

"When the acts which create the obstruction are in themselves unlawful, the intention to obstruct will be imputed to their author, although the attainment of other ends may have been his primary object." 7 Wall. 486.

In the case of U. S. v. Thomas, 55 Fed. 381, the transportation of the mails had been obstructed by some persons acting under the influence of a strike. Judge Jackson, in addressing the jury, submitted observations intended for the strikers. He said:

"You have no right to go into a strike and undertake to stop the transportation of the mails of the United States, undertake to stop the running of the cars of the country, or undertake to stop the business which is carried on the great highways of the country, and which is the mainspring to the success of a country like ours. If all this is done, then you step upon a right which you have no right to interfere with. I make these general remarks on

this occasion with a hope that I may reach the ear of the intelligent masses, that they may see at once the error they have fallen into. Rely not upon combination and strikes to protect your interests. They are disastrous, stopping your mills, and stopping the enterprises and business of the community which furnish the wage-earner the means to support his home. Do not resort to such measures to stop our manufactures, our mills, or the transportation of the mails of the United States, which is so great and important an element of our country for the comfort and welfare of society. If you take this thing up and look at it, and ponder over it, and see the result that must necessarily follow such a course of action, and the train of circumstances that must necessarily accompany it, you would refuse to enter into these combinations and strikes."

That the passage of the mails over certain lines of railroad in this state has been retarded and obstructed there is no question. The regular receipt and dispatch of mails over the roads of the Southern Pacific Company have in fact been suspended at the San Francisco post office for a period of about two weeks. Who is responsible for this state of affairs? The strikers, the railroad company, or both? The railway is a great public highway, and the duty of the railroad company as a common carrier is first to the public. The road must be kept in operation for the accommodation of the public, if it is possible to do so with the force and appliances within reach. Any negligence in this respect is not excused by temporary difficulties capable of being promptly removed. The damage and interruption caused by the elements usually receive prompt attention, that traffic may not be suspended longer than is absolutely necessary. The same energy and good faith should be observed with respect to the removal of labor and other difficulties. Railroad Co. v. Hazen, 84 Ill. 36. The present controversy between the Southern Pacific and its employés appears to be in relation to the movement of Pullman cars. Both parties to this controversy have announced in the public press that they have been ready and willing from the first to move freight cars and passenger trains without Pullman cars. In my opinion, the situation has been of such an extraordinary character, and the interruption to commerce and the transportation of the mails so serious and long-continued, as to have required of the railroad company to temporarily waive questions concerning the make-up of regular trains (as the officers of the company claim to have done), and employ such resources as the company had in the movement of other trains in an effort to relieve the prevailing congestion and distress. This obligation I believe to have been a public duty, and a willful failure to perform this duty with respect to the movement of the mails and interstate commerce is therefore, in my judgment, within the purview of the statute.

It is your duty to determine this question under the law as I have stated it to you, and present the guilty parties to the court for prosecution. In this inquiry you will not limit your examination to the conduct of any particular class of persons, but carefully scrutinize the acts of all parties concerned, whether they are officers of the railroad company or employés, and without fear or favor or influence of any kind point out in the proper manner the persons who have transgressed the law and imperiled the best interests of this state.

It is our duty to uphold the authority and majesty of the law, and see to it that those who have violated its provisions, whoever they may be, are brought to the bar of justice.

In your inquiry you may find that parties have so associated themselves together in their conduct as to bring them within the law of conspiracy. The statute of the United States upon that subject is as follows:

Section 5440. Rev. St.: "If two or more persons conspire either to commit any offense against the United States, or to defraud the United States in any manner, or for any purpose, and one or more of such parties do any act to effect the object of the conspiracy, all parties to such conspiracy shall be liable to a penalty of not more than ten thousand dollars, or to imprisonment for not more than two years, or to both fine and imprisonment, in the discretion of the court."

The elements of this offense are the combination or conspiracy to violate the law, and the overt act or acts to carry the conspiracy into effect. Where several persons are proved to have combined together for the same illegal purpose, any act done by one of the parties in pursuance of the original concerted plan, and with reference to the common object, is, in the contemplation of the law, the act of the whole party, and therefore the proof of such act will be evidence against any of the others who were engaged in the same conspiracy.

It is also true that any declaration made by one of the parties during the pendency of the illegal enterprise is not only evidence against himself, but is evidence against the other parties, who, as we have seen, when the combination is proved, are as much responsible as if they had done the act themselves. You will observe in this connection that the act of combination to violate the statute is the important element in the crime of conspiracy. The law regards the act of unlawful combination and confederacy as dangerous to the peace of society, and declares that such combination and confederation of several persons to commit crime requires an additional restraint to those provided for the commission of the crime, and makes criminal the conspiracy, with penalties and punishments, distinctive from those prescribed for the crime the subject of the conspiracy. You can readily appreciate why this is true. A conspiracy becomes powerful and effective in the accomplishment of its illegal purpose in proportion to the numbers, power, and strength of the combination to effect it. It is also true that, as it involves a number in a lawless enterprise, it is proportionally demoralizing to the well-being and character of the men engaged in it, and, as a consequence, to the safety of the community to which they belong. The statutes I have cited indicate the general character of the investigation you will be required to make concerning the affairs of the railroad company in the transportation of the mails and in the movement of interstate commerce. With the merits of the controversy between the railroad company and its employés you have nothing to do, except in so far as the facts relating thereto may furnish evidence as to the actual parties engaged in violating the laws of the United

States. The right of labor to organize for its own benefit and protection is not questioned. It has the same right in this respect as any other association, and, perhaps, in some respects, its freedom is properly greater. The laboring man is entitled to the highest wages and the best conditions he can command, but he is not entitled to interfere with the rights and property of others, and by force or other unlawful means seize upon the appliances of organized industry, and set at defiance the laws of the government. The right of workingmen to quit work, either singly or in a body (subject only to the civil obligations of contracts), is not denied, provided that the abandonment of service is accomplished in a peaceful and orderly manner; and here again the privilege or freedom must be exercised without interfering with the rights and property of others. It may be said that this freedom or privilege accorded to the laboring men, with the restrictions named, is of no great value, since he is thereby prevented from securing the protection he ought to have for his labor, and the power to redress his grievances. This may be true, and it may be conceded that the relations of labor to capital present a difficult problem for solution, but it seems to me that the intelligence of the people ought to solve this question in a peaceful and proper manner. It certainly cannot, with the consent of the courts, be settled by violence or any unlawful means.

It will appear to you from what I have said that a very serious and important duty devolves upon you as grand jurors of this court. Your oath requires you to diligently inquire and true presentments make "of such articles, matters, and things as shall be given you in charge or otherwise come to your knowledge touching the present service." The oath indicates the impartial spirit with which your duties should be performed. You are to present no one from envy, hatred, or malice, nor should you leave any one unpresented for fear, favor, affection, hope of reward or gain, but should present all things truly as they come to your knowledge, according to the best of your understanding. In each judicial district there is a United States attorney, appointed by the president to represent the interests of the government in the prosecution of parties charged with the commission of public offenses against the laws of the United States. The United States attorney for this district will therefore appear before you, and present the accusations which the government may desire to have considered by you. He will point out to you the laws other than those I have mentioned which the government deems to have been violated, and will subpoena for your examination such witnesses as he may consider important, and also such other witnesses as you may direct. In your investigations you will receive only legal evidence, to the exclusion of mere reports, suspicions, and hearsay evidence. Subject to this qualification, you will receive all the evidence presented which may throw light upon the matter under consideration, whether it tend to establish the innocence or the guilt of the accused. And more, if in the course of your inquiries you have reason to believe that there is other evidence not presented to you within your reach, which would qualify or

explain away the charge under investigation, it will be your duty to order such evidence to be produced. Formerly it was held that an indictment might be found if evidence were produced sufficient to render the truth of the charge probable. But a different and a more just and merciful rule now prevails. To justify the finding of an indictment you must be convinced, so far as the evidence before you goes, that the accused is guilty; in other words, you ought not to find an indictment unless, in your judgment, the evidence before you, unexplained and uncontradicted, would warrant a conviction by a petit jury. To authorize you to find an indictment or presentment, there must be a concurrence of at least 12 of your number,— a mere majority will not suffice. You are to keep your deliberations secret, and allow no one to question you as to your own action, or the action of your associates on the grand jury. In the progress of your examinations, should questions arise concerning which you may desire further instructions from the court, you may come into court for that purpose, and the law will be further explained to you with respect to such questions.